**Affirmed and Opinion Filed June 19, 2018**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-00879-CV

**HINGA MBOGO, HINGA'S AUTOMOTIVE CO., AND 3516 ROSS AVENUE, DALLAS, TEXAS, Appellants**

**V.**

**CITY OF DALLAS, MICHAEL S. RAWLINGS, IN HIS OFFICIAL CAPACITY AS MAYOR OF THE CITY OF DALLAS, TEXAS; SCOTT GRIGGS, IN HIS OFFICIAL CAPACITY AS CITY COUNCIL MEMBER; ADAM MEDRANO, IN HIS OFFICIAL CAPACITY AS CITY COUNCIL MEMBER; CASEY THOMAS, II, IN HIS OFFICIAL CAPACITY AS CITY COUNCIL MEMBER; CAROLYN KING ARNOLD, IN HER OFFICIAL CAPACITY AS CITY COUNCIL MEMBER; RICKEY D. CALLAHAN IN HIS OFFICIAL CAPACITY AS CITY COUNCIL MEMBER; MONICA R. ALONZO, IN HER OFFICIAL CAPACITY AS CITY COUNCIL MEMBER; TIFFINNI A. YOUNG, IN HER OFFICIAL CAPACITY AS CITY COUNCIL MEMBER; ERIK WILSON, IN HIS OFFICIAL CAPACITY AS CITY COUNCIL MEMBER; MARK CLAYTON, IN HIS OFFICIAL CAPACITY AS CITY COUNCIL MEMBER; B. ADAM MCGOUGH, IN HIS OFFICIAL CAPACITY AS CITY COUNCIL MEMBER; LEE M. KLEINMAN, IN HIS OFFICIAL CAPACITY AS CITY COUNCIL MEMBER; SANDY GREYSON, IN HER OFFICIAL CAPACITY AS CITY COUNCIL MEMBER; JENNIFER S. GATES, IN HER OFFICIAL CAPACITY AS CITY COUNCIL MEMBER; PHILLIP T. KINGSTON, IN HIS OFFICIAL CAPACITY AS CITY COUNCIL MEMBER Appellees**

**On Appeal from the 68th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-16-07983**

## MEMORANDUM OPINION

Before Justices Bridges, Myers, and Schenck
Opinion by Justice Bridges

Appellants Hinga Mbogo, Hinga's Automotive Co., and 3516 Ross Avenue, Dallas, Texas

(Hinga) appeal from the trial court's order granting the City's plea to the jurisdiction, which

dismissed Hinga's counterclaims and third-party claims against the City and its officials.[1]  In three issues, Hinga challenges the constitutionality of zoning ordinances under article I, sections 16, 17, and 19 of the Texas Constitution, contending that the City's failure to further exempt his property from certain zoning requirements amounts to an unconstitutional retroactive application and deprives him of settled expectations in the use of his property.  We affirm the trial court's order.

## Background

Hinga opened Hinga's Automotive Company, a general repair shop on Ross Avenue in Dallas, Texas, in 1986.  At that time, the City's zoning ordinances allowed automobile-related businesses on Ross Avenue.

In 1988, the City issued the "Planned Development District 298 Bryan Area Study."  The study recognized that "[e]stablishing linkages to regional activity centers *(objective 8)*, was recommended to take advantage of the area's proximity to the Central Business District and to many other attractions in the downtown area."  It further acknowledged the following:

> Ross Avenue has the potential to be a corridor prime for economic development.  At present, a large number of automotive related uses exist along the corridor.  These uses are not conducive to having professional offices located next door due to noise and odors associated with many of them.  Also, fencing material used to protect the contents of these establishments creates the look of a maximum security facility along the corridor.

The study found the number of used car lots and vehicle repair shops along Ross Avenue an "issue of concern" that gave the area "an industrial feel as opposed to an urban character."  The study also found that "many of these types of uses are non-conforming in the sub-districts in which they exist."

---

[1] The "City" includes Michael S. Rawlings, in his official capacity as Mayor of the City of Dallas, and City council members.

Subsequently, the City passed ordinance no. 20049, which created Planned Development District No. 298 (PD 298).[2] Once PD 298 was passed, "vehicle or engine repair or maintenance" was prohibited on Ross Avenue where Hinga's business was located. At that time, Hinga was fully aware that continuing his business became a "nonconforming use." The Dallas Development Code defines "nonconforming use" as "a use that does not conform to the use regulations of this chapter, but lawfully established under the regulations in force at the beginning of operation and has been in regular use since that time." Dallas, Tex., Dallas City Code § 51A-2-2.102(90) (2017).[3]

In 1991, Hinga purchased the property with three business partners and later invested approximately $80,000 in improving the building for auto repairs by installing lifts, ventilation, specialized equipment, and an emissions-testing machine. Hinga made these improvements knowing use of the property was nonconforming.

The City reevaluated the 1988 Bryan Area Study in March 2004 "to determine if development was meeting the objectives" of the study and "to make recommendations to adjust regulations that were falling short."

The City subsequently passed Ordinance No. 25960 on April 27, 2005, which amended PD 298 and codified specific provisions related to nonconforming uses in Dallas Development Code section 51P-298.108(b). In addition to establishing deadlines for nonconforming use property to comply, it allowed the owner of a nonconforming use to appeal to the board of adjustment for a later compliance date if the owner would not be able to recover his investment in the use by the conformance date in the subsection. Dallas City Code § 51P-298.108. Uses that became nonconforming on April 25, 2005 were issued a compliance date of April 26, 2010, and uses that

---

[2] A planned development district is a specialized zoning regulation for a particular piece of property that deviates in some way from the City development code. It is often based on a land use study by the City and used to change the zoning for a particular area.

[3] The Dallas City Code addresses compliance regulations for nonconforming uses. It provides that "any person who resides or owns real property in the city may request that the board consider establishing a compliance date for a nonconforming use." *Id*. § 51A-4.704(a)(1)(A). If, after a hearing, the board determines that continued operation of the use will have an adverse effect on nearby properties, "it shall proceed to establish a compliance date for the nonconforming use." *Id*.

were nonconforming prior to April 25, 2005, received a compliance date of April 26, 2008. *Id.* Such compliance dates were deemed necessary "to achieve the desired urban scale development and improve opportunity to maximize development potential."

Despite Hinga's opposition to the amended ordinance, he was required to bring his property into compliance by April 26, 2010. While other automotive businesses left the area, Hinga continued to run his business through his initial compliance period. In April 2010, he requested a new compliance date. The Board of Adjustment gave him a new compliance date of April 13, 2013 "for the nonconforming vehicle or engine repair or maintenance shop currently being operated on the property."

In August 2013, before the expiration of the extended compliance date, Hinga filed a zoning change application with the City to create a specific use permit (SUP) in which vehicle or engine repair or maintenance use would be permitted and to obtain a SUP for a ten-year period. The City passed ordinance no. 29099, which created a subarea within PD 298, allowing a SUP for vehicle or engine repair or maintenance use and passed ordinance no. 29101 granting Hinga a SUP for a two-year period, ending on August 14, 2015.

Hinga's SUP expired, but he submitted an application for a new SUP to extend the property use for three years with eligibility for one automatic two-year renewal. A senior planner with the City told Hinga that because his request was modest and he received approval two years ago, she would recommend approval of the new SUP.

On February 4, 2016, the City Plan Commission held a public hearing to consider Hinga's SUP. During the hearing, Hinga's attorney recognized that "10 or 20 years from now, Hinga's Automotive probably wouldn't fit into the way Ross Avenue is going to look. But right now it fits in just fine, and it's actually a benefit." Hinga, along with other citizens in support of him, also spoke during the hearing. Hinga's goal was to continue his business long enough for the property

value to increase so he could sell to a developer and recoup his investment rather than "los[e] his retirement savings if he just sells for whatever he can get now." Linda Collins, president of the Bryan Place Neighborhood Association spoke in opposition. She emphasized that many other auto repair shops had complied with the ordinance and moved locations. Further, Hinga "was told quite clearly that there would be no more extensions" after 2013. She also reminded the City Plan Commission that Hinga already had a new location, with his sign hanging and a phone number listed, so denying his request would not severely impact him. She encouraged the City to finally enforce the zoning codes that had been in place for years and "make the transformation happen" on Ross Avenue. Many other individuals from the neighborhood also spoke in opposition to any further SUP for the property.

One commissioner reminded Hinga of the hearing two years earlier when the City first approved the SUP. During that hearing, Hinga said he only needed two years to either sell, relocate, or retire. Hinga recalled making the statement, but argued nothing had changed in the two years and he was still unable to sell his property for a "fair" offer. However, he admitted he never listed the property for sale but based his opinion on what real estate agents told him.

At the conclusion of the hearing, the City Plan Commission recommended denial of Hinga's SUP. He then appealed the denial of the recommendation to the City Council for further consideration. City Council held another public hearing on April 13, 2016 and denied Hinga's appeal.

After August 15, 2015, Hinga continued to run his business without a SUP in violation of PD 298. The City sued Hinga on July 5, 2016 for a temporary and permanent injunction to stop him from operating his auto repair business in violation of PD 298. It sought fines of $1,000 a day for each day that Hinga operated the auto shop after his SUP expired. Hinga answered, counterclaimed, and filed third-party claims against the City, the Mayor, and City Council

members alleging their efforts to enforce the ordinances violated article I, sections 16, 17, and 19 of the Texas Constitution. The City, Mayor, and Council members filed a plea to the jurisdiction seeking dismissal of Hinga's counterclaims and third-party claims. After a hearing, the trial court granted the plea to the jurisdiction. This accelerated interlocutory appeal followed.

## Plea to the Jurisdiction Standard of Review

A plea to the jurisdiction is a dilatory plea in which a party challenges a court's authority to determine the subject matter of the action. *Rawlings v. Gonzalez*, 407 S.W.3d 420, 425 (Tex. App.—Dallas 2013, no pet.). The existence of subject matter jurisdiction is a question of law; therefore, we review de novo the trial court's ruling on a plea to the jurisdiction. *Id*.

A governmental entity's plea to the jurisdiction can be based on pleadings or evidence. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). When, as here, a jurisdictional challenge implicates the merits of the plaintiff's cause of action, we consider the relevant evidence submitted by the parties to determine jurisdictional issues raised. *Id*. at 227.

The standard of review for a jurisdictional plea based on evidence "generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c)." *Id*. at 228; *City of Dallas v. Prado*, 373 S.W.3d 848, 852 (Tex. App.—Dallas 2012, no pet.). We take as true all evidence favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *Prado*, 373 S.W.3d at 853. The burden is on the City, as movant, to meet the standard of proof. *Id*. If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the factfinder. *Id*. However, if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id*.

In Texas, sovereign immunity deprives a trial court of subject matter jurisdiction for lawsuits against the State unless the State consents to suit. *Miranda*, 133 S.W.3d at 224. This

governmental immunity likewise protects a city (referred to as governmental immunity) when it exercises discretionary powers of a public nature involving judicial or legislative functions. *City of Tyler v. Likes*, 962 S.W.2d 489, 501 (Tex. 1997); *Tex. Dep't of Aging & Disability Servs. v. Beltran*, 350 S.W.3d 410, 413 n.2 (Tex. App.—El Paso 2011, pet. denied) (although the terms are often used interchangeably, sovereign immunity refers to the State's immunity, while governmental immunity from liability protects political subdivisions of the State such as counties, cities, and school districts). Building codes and inspections and zoning, planning, and plat approval are governmental functions. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(28), (29) (West 2011).

To establish subject matter jurisdiction against the City, Hinga's pleadings must establish the City's consent to suit. Mere reference to a legislative waiver does not establish consent to be sued and is not enough to confer jurisdiction on the trial court. *Tex. Dep't of Criminal Justice v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001).

Here, Hinga brought his claims under the Uniform Declaratory Judgment Act (UDJA). While the UDJA waives governmental immunity for certain claims, it is not a general waiver of immunity. *Tex. Parks & Wildlife Dep't v. Sawyer Trust*, 354 S.W.3d 384, 388 (Tex. 2011). The UDJA "does not enlarge the trial court's jurisdiction, but is 'merely a procedural device for deciding cases already within a court's jurisdiction.'" *Id.* Thus, governmental immunity will bar an otherwise proper UDJA claim that has the effect of establishing a right to relief against the State for which the legislature has not waived governmental immunity. *Id.* Therefore, even when asserting a claim under the UDJA, the claimant must plead a viable constitutional claim. *City of Houston v. Downstream Envtl., L.L.C.*, 444 S.W.3d 24, 38 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

**Article I, § 16 of the Texas Constitution**

In his first issue, Hinga argues the City's ordinances, as applied to him, are unconstitutionally retroactive because "they destroy [his] settled expectations and attach new disabilities to his business, which [were] legal when he opened it in 1986 but became illegal years later." The City responds Hinga did not and cannot allege a viable claim that the zoning is a retroactive law; therefore, the trial court correctly granted the City's plea to the jurisdiction.

Article I, section 16 of the Texas Constitution prohibits the creation of retroactive laws. TEX. CONST., art. I, § 16. A retroactive law is one that extends to matters that occurred in the past. *Tenet Hosp. Ltd. v. Rivera*, 445 S.W.3d 698, 707 (Tex. 2014).

Hinga argues ordinances passed by the City in April 2005 and August 2013 are retroactive because they attach new legal consequences to events completed before their enactment—specifically, that when he obtained his permits and substantially invested in the property, he had no notice the City would at some point make his use illegal, and it was reasonable for him to expect that the City would continue to allow him to use the property accordingly. Thus, Hinga is not challenging the City's decision to make his property nonconforming, but rather is challenging the City's decision to force him to stop operating an auto repair shop on Ross Avenue.

A statute does not operate retrospectively merely because it is applied in a case arising from conduct antedating the statute's enactment or "upsets expectations based in prior law." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994). Further, "There are strong policy arguments and a demonstrable public need for the fair and reasonable termination of nonconforming property uses . . . ." *City of Univ. Park v. Benners*, 485 S.W.2d 773, 778 (Tex. 1972), *abrogated on other grounds by Bd. of Adjustment of City of San Antonio v. Wende*, 92 S.W.3d 424 (Tex. 2002).

Here, when the City amended PD 298 by ordinance no. 25960 in April 2005, it established deadlines for nonconforming use property to comply and allowed the owner of a nonconforming use to appeal to the board of adjustment for a later compliance date if the owner would not be able to recover his investment in the use by the designated conformance date. Dallas City Code § 51P-298.108. The ordinance provided that it "shall take effect immediately from and after its passage and publication." The ordinance did not change any use in the property thereby attaching a new legal consequence or upset any expectations based in prior law. Rather, it prospectively altered a property owner's future use of the property by setting a deadline by which to come into compliance.

The same is true of the ordinances creating a SUP for Hinga's business and establishing the deadline for when it expired. The ordinances took "effect immediately from and after its passage and publication." The ordinances prospectively altered Hinga's future use of the property for a known length of time.

In *Landgraf*, the Court explained that "familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance" when determining whether a statue is retroactive. 511 U.S. at 270. The ordinances at issue provided Hinga with fair notice that both his nonconforming use and SUP would expire at a definitive future date. Moreover, "Property owners do not acquire a constitutionally protected vested right in property uses once commenced or in zoning classifications once made." *Benners*, 485 S.W.2d at 778. As such, Hinga's reliance and expectation that the City would allow him to continue using the property as a nonconforming use or under a SUP in perpetuity was not reasonable. We agree with the City that under these facts, the ordinances at issue are not retroactive.

However, even if we concluded the ordinances were retroactive, not all retroactive laws are unconstitutional. *Tenet Hosp. Ltd*., 445 S.W.3d at 707; *see also Robinson v. Crown Cork &*

*Seal Co.*, 335 S.W.3d 126, 139 (Tex. 2010) (mere retroactivity is not sufficient to invalidate a statute or ordinance).

The presumption against retroactivity has two fundamental objectives identified by the Supreme Court in *Landgraf*. 511 U.S. at 265. First, it protects a person's reasonable, settled expectations. *Id*. Second, it protects against abuses of legislative power. *Id*. at 266. "Still, not all retroactive legislation is bad." *Robinson*, 335 S.W.3d at 139 (discussing *Landgraf*).

The Texas Supreme Court recognized in *Robinson* that "[n]o bright-line test for unconstitutional retroactivity is possible." *Id*. at 145. Rather, in determining whether a statute or ordinance violates the prohibition against retroactive laws, courts must consider three factors in light of the prohibitions dual objectives: (1) the nature and strength of the public interest served by the statute as evidenced by the legislature's findings; (2) the nature of the prior right impaired by the statute; and (3) the extent of the impairment. *Id*. The perceived public advantage of a retroactive law is not simply to be balanced against its relatively small impact on private interest or the prohibition would be deprived of most its force. *Id*. at 146. Accordingly, there must be a compelling public interest to overcome the heavy presumption against retroactive laws. *Id*. However, "courts must be mindful that statutes are not to be set aside lightly." *Id*.

Zoning is an exercise of a municipality's legislative powers. *City of Pharr v. Tippitt*, 616 S.W.2d 173, 175 (Tex. 1981). A municipal ordinance is presumed to be valid, and the burden of showing its invalidity rests on the party attacking it. *Safe Water Found. of Tex. v. City of Houston*, 661 S.W.2d 190, 192 (Tex. App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.); *see also Patterson v. City of Bellmead*, No. 10-12-00357-CV, 2013 WL 1188929, at *6 (Tex. App.—Waco Mar. 21, 2013, pet. denied) (mem. op.).

We begin by considering the nature and extent of the prior right impaired by the ordinance. *See Robinson*, 335 S.W.3d at 145–49. The law is clear that an individual has no protected property

interest in the continued use of his property for a particular purpose just because such use has commenced or a zoning classification has been made. *Benners*, 485 S.W.2d at 778.

> There are strong policy arguments and a demonstrable public need for the fair and reasonable termination of nonconforming property uses which most often do not disappear but tend to thrive in monopolistic positions in the community. We are in accord with the principle that municipal zoning ordinances requiring the termination of nonconforming uses under reasonable conditions are within the scope of municipal police power; and that property owners do not acquire a constitutionally protected vested right in property uses once commenced or in zoning classifications once made. Otherwise, a lawful exercise of the police power by the governing body of the City would be precluded.

*Id*.

Here, any interest that Hinga had in the use of his property is not "firmly vested." *See, e.g., Tex. Ed. Agency v. Am. YouthWorks, Inc.*, 496 S.W.3d 244, 263 (Tex. App.—Austin, 2016) (any interest charter school might have in its charter is "far from" firmly vested given its subject to numerous conditions and discretionary control by the State), *aff'd*, No. 16-0519, 2018 WL 1975025 (Tex. Apr. 27, 2018); *City of Beaumont v. Starvin Marvin's Bar & Grill, L.L.C.*, No. 09-11-00229-CV, 2011 WL 6748506, at *4 (Tex. App.—Beaumont, Dec. 22, 2011, pet. denied) (use of a leased property as a restaurant with live outdoor music is not a constitutionally protected vested property right); *City of La Marque v. Braskey*, 216 S.W.3d 861, 864 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (concluding use of facility for cats, in violation of city ordinance, was not a constitutionally protected vested right because it concerned only the way property was used, which is not an absolute right). *But see Robinson*, 335 S.W.3d at 148 (concluding "mature tort" based on mesothelioma was firmly vested and retroactive law should not extinguish it). Hinga concedes that prior to his purchase of the property the existing zoning standard rendered his use non-conforming. Despite Hinga's arguments to the contrary, it was not reasonable for him to "expect that because the City permitted auto repair shops on Ross Avenue" when he originally

obtained his permits, "it would continue to do so in the future." To agree with Hinga would mean the City could never decline further exemptions from nonconforming uses simply because of having issued a prior permit or permits to allow time for the owner to comply or relocate.

We acknowledge that based on language in *Robinson* a "vested right" may no longer be required. *Id*. ("What constitutes an impairment of vested rights is too much in the eye of the beholder to serve as a test for unconstitutional retroactivity."). However, the supreme court has not overruled *Benners*, and courts have continued to cite it for the proposition that an individual has no protected property interest in the continued use of his property for a particular purpose. *See, e.g., Sumner v. Bd. of Adjustments of Spring Valley Village, TX*, Civil Action No. H-12-2551, 2013 WL 1336604, at \*6 (S.D.Tex. 2013); *Wild Rose Rescue Ranch v. City of Whitehouse*, 373 S.W.3d 211, 216 (Tex. App.—Tyler 2012, no pet.). As Hinga correctly recognizes, we are bound to follow supreme court precedent. *See Owen v. Jim Allee Imports, Inc.*, 380 S.W.3d 276, 284 (Tex. App.—Dallas 2012, no pet.).[4]

As the court stated in *Robinson*, "the constitutional prohibition against retroactive laws does not insulate every vested right from impairment, nor does it give way to every reasonable exercise of the Legislature's police power; it protects settled expectations that rules are to govern the play and not simply the score, and prevents the abuses of legislative power that arise when individuals or groups are singled out for special reward or punishment." 335 S.W.3d at 145.

When Hinga purchased the property he knew "the rules" governing "the play," meaning he knew operating an automotive repair shop on Ross Avenue was a nonconforming use. It was at his own risk that he continued investing money in the automotive business despite knowing his use was nonconforming and the City could establish a compliance date at any time. Dallas City

---

[4] In his brief, Hinga argued *Benners* was wrongly decided and contradicts the majority view of courts in this country. He presented the argument "to preserve it for further appeals."

Code § 51A-4.704(a)(1)(A) ("The city council may request that the board of adjustment consider establishing a compliance date for a nonconforming use."). In fact, once the City amended PD 298 in 2005 and established deadlines for nonconforming use property to comply, Hinga took advantage of his right to appeal and requested a later compliance date, which the City granted. Between the nonconforming use extension and his SUP, the City granted Hinga an extended use of his business through August 2015. When the City granted his SUP, his expectation to operate his business continued for only two years. Thus, the City has not sought to single out Hinga for any punishment. To the contrary, the City allowed him to run a business from 1991 through 2015 as either a nonconforming use or under a SUP; however, his use became illegal once his SUP expired. *See id.* § 51A-704(a)(1)(E) ("If the board establishes a compliance date for a nonconforming use, the use must cease operations on that date and it may not operate thereafter unless it becomes a conforming use."); § 51A-705(a)(4) ("The issuance of a SUP does not confer any nonconforming rights. No use authorized by the issuance of a SUP may operate after the SUP expires."). More importantly, the City provided Hinga an extended time to try and recoup his investment when it granted the SUP. Courts have long recognized that the impairment of a right may be lessened when an ordinance affords a plaintiff a grace period to bring a claim or a reasonable time to protect his investment. *See Tenet Hosp. Ltd.*, 445 S.W.3d at 708; *Tex. Water Rights Comm'n v. Wright*, 464 S.W.2d 642, 648 (Tex. 1971). The fact that Hinga did not believe that he could get a fair price, despite *never* listing his property on the market, does not equate to the City abusing its legislative power.

We next consider the nature and strength of the public interest element. The City conducted the Bryan Area Study in 1988. The study identified eight goals in an effort to "encourage redevelopment and commercial activity." It recognized that Ross Avenue had the potential to be a corridor "prime for economic development," but the large number of automotive related

businesses made such development difficult.  In fact, the study discovered that 1/3 (approximately forty-eight) of the businesses along Ross Avenue were automotive in nature.  In light of the City's vision for this area, it enacted PD 298 and then determined seventeen years later "it is in the public interest to amend" it to include mixed-use developments.

When the City recommended the amendment to PD 298 in 2005, it sent notices to 1248 property owners.  Of those who received notices, eighty-one replied in favor of the amendment and thirty-two were against it.  The amendment ultimately allowed nonconforming use owners an additional two years to come into compliance.  It also allowed an owner to appeal for a later compliance date if an owner could not recover his investment.

Throughout the process, the City held multiple hearings in which both Hinga and citizen opponents voiced concerns prior to the City making a final determination in 2016 to deny Hinga another SUP extension.  By this time, most area businesses were in compliance with the ordinance.

In *Robinson*, the supreme court noted that the statute at issue was enacted solely for the benefit of a single company to reduce its liability in asbestos litigation and, therefore, constituted only a slight public interest.  *Robinson* 335 S.W.3d at 150.  By contrast, the ordinances in the present case were not enacted to benefit a single entity but to improve the Bryan District Area for the public interest of the City.  *See, e.g., Tenet Hosp. Ltd.*, 445 S.W.3d at 707 (concluding repose statute was part of comprehensive overhaul of Texas medical malpractice law that served a compelling public interest in considering retroactivity challenge rather than a single person).  Thus, the ordinance at issue here is distinguishable from the retroactive statute in *Robinson*.

Hinga cites to *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984) to support his position that promoting aesthetics or physical appearance is not a compelling government interest.  First, Hinga cites from the dissenting opinion, which is not controlling.  *See id*. at 823 (Brennan, J., dissenting).  Second, that case involved a determination

of whether a city code prohibiting the posting of public signs on public property violated freedom of speech and was therefore unconstitutional on its face or as applied. *Id*. at 792. The Court limited its analysis of "the constitutionality of the ordinance to the concrete case before us" and upheld the ordinance. *Id*. at 803. More importantly, it "accept[ed] the City's position that it may decide that the esthetic interest in avoiding 'visual clutter' justifies the removal of signs creating or increasing that clutter." *Id*. at 816. Thus, the cited authority does not support Hinga's position.[5]

Accordingly, the nature and strength of the public interest prong, as evidenced by the City's factual findings, supports the conclusion that the City's ordinances do not violate retroactivity. *See, e.g., Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 57 (Tex. 2014) (considering legislature's findings to support enactment of statue).

Having considered the *Robinson* factors, the City's ordinances are not unconstitutionally retroactive as a matter of law. Because Hinga failed to plead a viable article I, section 16 constitutional claim under the UDJA, the trial court did not err in granting the City's plea to the jurisdiction. We overrule Hinga's first issue.

### Article I, § 19 of the Texas Constitution

In his second issue, Hinga argues the ordinances deprive him of due course of law pursuant to article I, section 19 of the Texas Constitution. Specifically, he argues, "Ordinance No. 29099, and any other ordinance, statute or rule, that prevents Defendants from operating a vehicle or engine repair or maintenance facility at 3516 Ross Avenue, Dallas, Texas 75204 violate Article I, § 19 of the Texas Constitution as applied to Defendants."

The Texas Constitution provides that "[n]o citizen of this State shall be deprived of life, liberty, property, or privileges or immunities . . . except by due course of the law of the land."

---

[5] Hinga also cited to several federal cases from other circuits. We are not bound by such authority. *See City of Carrollton v. Singer*, 232 S.W.3d 790, 797 fn.6 (Tex. App.—Fort Worth 2007, pet. denied).

TEX. CONST., art. I, § 19; *see also Univ. of Tex. Med. Sch. at Houston v. Than*, 901 S.W.2d 926, 929 (Tex. 1995) (acknowledging no meaningful distinction exists between the terms "due process" and "due course of law"). Before any substantive due process rights attach, however, a party must have a liberty or property interest that is entitled to constitutional protection. *Klumb v. Houston Mun. Emp. Pension Sys.*, 458 S.W.3d 1, 15 (Tex. 2015). A constitutionally protected right must be a "vested right," which is something "more than a mere expectancy based upon an anticipated continuance of an existing law." *Id.* (citing *City of Dallas v. Trammell*, 101 S.W.2d 1009, 1014 (1937)). To the extent Hinga argues a right need not be vested in order to be protected by the Texas Constitution, his assertion directly contradicts *Klumb*.

Property owners do not have a constitutionally protected, vested right to use property in any way they choose without restriction and despite existing rules in force at the time they acquire it. *See, e.g., City of Beaumont*, 2011 WL 6748506, at *4; *Braskey*, 216 S.W.3d at 864. As such, he does not have a vested property right to maintain a business as a nonconforming use under the City's zoning ordinances. *See City of Grapevine v. CBS Outdoor, Inc.*, No. 02-12-00040-CV, 2013 WL 5302713, at *8 (Tex. App.—Fort Worth Sept. 19, 2013, no pet.) (mem. op. on reh'g) ("property owner does not acquire constitutionally protected right in a property use merely because it began as a conforming use and is later rendered nonconforming"); *Hang On III, Inc. v. Gregg Cty.*, 893 S.W.2d 724, 725 (Tex. App.—Texarkana 1995, writ dism'd by agr.). Rather, Hinga's pleadings rely on a unilateral expectation that the City would allow him to use the property as an auto repair business perpetually. *See, e.g., Dallas Cty. v. Gonzales*, 183 S.W.3d 94, 111 (Tex. App.—Dallas 2006, pet. denied) (to have a protected property interest, one must have more than a unilateral expectation of it). However, the city code allowed the city council or any person who resides or owns real property in the City to request the board to consider establishing a compliance

date for a nonconforming use. As such, Hinga's nonconforming use was subject to a potential challenge at any time.

Hinga has failed to establish he has a vested property interest entitled to due process. Having reached this conclusion, we need not consider whether the City's ordinances were rationally related to a legitimate government interest or when considered as whole, whether the ordinances were so burdensome as to be oppressive. *See* TEX. R. APP. P. 47.1; *Patel v. Tex. Dep't of Licensing & Regulation*, 469 S.W.3d 69, 87 (Tex. 2015).

Accordingly, Hinga has failed to plead a viable constitutional claim under article I, section 19 of the Texas Constitution waiving the City's governmental immunity. Thus, the trial court did not err by granting the City's plea to the jurisdiction as to this claim. Hinga's second issue is overruled.

### Article I, § 17 of the Texas Constitution

In his final issue, Hinga argues the City ordinances destroy his private property interests for the benefit of private entities in violation of article I, section 17 of the Texas Constitution. The State responds Hinga has not pleaded a valid takings claim or any violation of a vested property right protected by article I, section 17.

Article I, section 17 of the Texas Constitution provides in relevant part:

> (a) No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person . . .
>
> (b) In this section, "public use" does not include the taking of property under Subsection (a) of this section for transfer to a private entity for the primary purpose of economic development or enhancement of tax revenues.

TEX. CONST., art. I, § 17. Hinga admits he is not making an inverse condemnation or regulatory takings claim. Rather, he argues the 2009 amendments to the constitution, which added section (b) prevents the government from destroying or depriving him of his right to use his property for

the benefit of private entities—in this case, for example, a Starbucks or Macaroni Grill, which fits in more with the City's "vision" for the Ross Avenue area. Stated differently, he argues any governmental action that damages or destroys private property for the benefit of private entities is specifically prohibited.

In support of his argument, Hinga cites *Spann v. City of Dallas*, 235 S.W. 513, 515 (Tex. 1921). In that case, the court stated, "Property in a thing consists not merely in its ownership and possession, but in the unrestricted right of use, enjoyment, and disposal. . . . If the right of use be denied, the value of the property is annihilated and ownership is rendered a barren right." However, the court further acknowledged it is a right "that takes into account the equal rights of others, for it is qualified by the obligation that the use of the property shall not be to the prejudice of others." *Id*. The rights of private property owners, of course, are not absolute and are subject to restrictions such as zoning laws, as is the case here.

Hinga's position appears to be that any restriction on his desired use of the property results in unconstitutional damage or destruction to his property. That is simply not the case. As explained above, Hinga has no vested property interest in the use of his property in violation of existing zoning standards. *See Benners*, 485 S.W.2d at 778 ("Property owners do not acquire a constitutionally protected vested right in property uses once commenced or in zoning classifications once made."); *see also CBS Outdoor, Inc.*, 2013 WL 5302713, at *8 (same). A person asserting a valid article I takings claim much show that he has a vested property interest. *See Cypress Forest Pub. Util. Dist. v. Kleinwood Mun. Util. Dist.*, 309 S.W.3d 667, 675 (Tex. App.—Houston [14th Dist.] 2010, no pet.). Here, although the City's ordinances limit the particular use of Hinga's property, the City has not destroyed or deprived him of any vested right to make use of the property. Therefore, under the facts of this case, Hinga has failed to plead a viable constitutional takings claim under article I, section 17 of the Texas Constitution.

Accordingly, the trial court properly granted the City's plea to the jurisdiction. We overrule Hinga's third issue.

**Dismissal of Mayor and City Council Members**

Hinga brought suit against the City, the Mayor, and City council members. The City argues Hinga has waived any challenges to the trial court's dismissal of his claims against the Mayor and City council members because he failed to sufficiently brief any arguments against these parties.

Throughout Hinga's pleadings, he defined the City to include the third-party defendants, which included the Mayor and each individual council member in their official capacities. A government employee has the same immunity from suit against him in his official capacity as his employer, unless he has acted *ultra vires*. *See Univ. of Tex. Health Science Ctr. at San Antonio v. Bailey*, 332 S.W.3d 395, 401 (Tex. 2011). Here, Hinga has not pleaded any *ultra vires* fact*s* against the Mayor or City council members. Rather, his arguments against the City apply to the other third-party defendants. Accordingly, our conclusion that the trial court properly granted the City's plea to the jurisdiction likewise extends to the Mayor and City council members.

**Conclusion**

Hinga failed to plead any viable constitutional claims in violation of articles 16, 17, or 19 of the Texas Constitution. Therefore, the trial court did not have subject matter jurisdiction over his claims and properly granted the City's plea to the jurisdiction.

The order of the trial court is affirmed.

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE

170879F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

HINGA MBOGO, HINGA'S
AUTOMOTIVE CO., AND 3516 ROSS
AVENUE, DALLAS, TEXAS, Appellants

No. 05-17-00879-CV     V.

CITY OF DALLAS, MICHAEL S.
RAWLINGS, in his official Capacity as
Mayor of the City of Dallas, Texas; SCOTT
GRIGGS, in his official capacity as
City Council Member; ADAM
MEDRANO, in his official capacity as City
Council Member; CASEY THOMAS, II, in
his official capacity as City Council
Member; CAROLYN KING ARNOLD, in
her official capacity as City Council
Member; RICKEY D. CALLAHAN in his
official capacity as City Council Member;
MONICA R. ALONZO, in her official
capacity as City Council Member;
TIFFINNI A. YOUNG, in her official
capacity as City Council Member; ERIK
WILSON, in his official capacity as City
Council Member; MARK CLAYTON, in
his official capacity as City Council
Member; B. ADAM McGOUGH, in his
official capacity as City Council Member;
LEE M. KLEINMAN, in his official
capacity as City Council Member; SANDY
GREYSON, in her official capacity as City

On Appeal from the 68th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-16-07983.
Opinion delivered by Justice Bridges.
Justices Myers and Schenck participating.

Council Member; JENNIFER S. GATES,
in her official capacity as City Council
Member; PHILLIP T. KINGSTON, in his
official capacity as City Council Member,
Appellees

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees CITY OF DALLAS, MICHAEL S. RAWLINGS, in his official capacity as Mayor of the City of Dallas, Texas; SCOTT GRIGGS, in his official capacity as City Council Member; ADAM MEDRANO, in his official capacity as City Council Member; CASEY THOMAS, II, in his official capacity as City Council Member; CAROLYN KING ARNOLD, in her official capacity as City Council Member; RICKEY D. CALLAHAN in his official capacity as City Council Member; MONICA R. ALONZO, in her official capacity as City Council Member; TIFFINNI A. YOUNG, in her official capacity as City Council Member; ERIK WILSON, in his official capacity as City Council Member; MARK CLAYTON, in his official capacity as City Council Member; B. ADAM McGOUGH, in his official capacity as City Council Member; LEE M. KLEINMAN, in his official capacity as City Council Member; SANDY GREYSON, in her official capacity as City Council Member; JENNIFER S. GATES, in her official capacity as City Council Member; PHILLIP T. KINGSTON, in his official capacity as City Council Member, recover their costs of this appeal from appellants HINGA MBOGO, HINGA'S AUTOMOTIVE CO., AND 3516 ROSS AVENUE, DALLAS, TEXAS.

Judgment entered June 19, 2018.